

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| DEANNA K. BERRY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:06-CV-062-C |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Plaintiff Deanna K. Berry seeks judicial review of a decision of the Commissioner of Social Security denying her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court has reviewed the administrative record and the arguments of the parties under the substantial evidence standard set forth under 42 U.S.C. § 405(g) and has determined that the Commissioner's decision should be reversed and remanded for further administrative proceedings.

I.  **Facts**

Berry alleged in application documents that she suffered from a number of impairments including depression, pancreatitis, migraine headaches, nausea, complications

from surgeries, and kidney problems. (Tr. 863.) She also reported that she stopped working on October 8, 2000, after a co-worker assaulted her and that she suffered from post-traumatic stress disorder, depression, and anxiety and was afraid to go places by herself.[1] (Tr. 108, 267, 330-31, 345, 871.)

The Administrative Law Judge (ALJ) determined at the fourth step of the sequential disability analysis that despite her impairments, Berry retained the capability of performing work at the medium exertional level and was not disabled because she could perform her past work. (Tr. 23-24.) The Appeals Council denied review. (Tr. 4-6.) The ALJ's decision is therefore the Commissioner's final decision and is properly before the court for review. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).

## II. Discussion

Berry brings three points of error related to the ALJ's analysis of her mental impairments. She argues that the ALJ failed to properly analyze her mental residual

---

[1] At the time of the assault Berry was training to drive an eighteen-wheel truck with a transportation company and was nearing the end of her training. (Tr. 199.) On the day of the assault she was driving in the vicinity of Joplin, Missouri, while her trainer was asleep in the truck sleeper. Berry did not take the exit near Joplin her trainer had instructed her to take, and when Berry woke her trainer he came out of the sleeper extremely upset and began screaming and swearing at her. Berry slowed the truck suddenly to negotiate a curve on an access road and hit the brakes too hard, which sent the trainer tumbling to the front of the truck. (*Id.*) The trainer then reportedly hit Berry in the face while she was driving and continued to hit her after she stopped the truck until she was forced back into the sleeper. After he stopped hitting her he handed her a towel to wipe blood from her face and arm and then drove the truck to a truck stop where he slammed on the brakes throwing Berry to the floor of the truck. (*Id.*) At the truck stop the trainer began hitting Berry again and threw her things out of the truck. He then exited the truck and called the company office, and Berry called 911. Although police officers arrived thereafter and stabilized the situation, the trainer threatened Berry by telling her that it was not over and that he and his friends would retaliate against her. (*Id.*; Tr. 268, 706.) Berry later reported to a neuropsychologist that violence had never been a part of her life and she had never been in a fight before the assault. (Tr. 199.)

functional capacity, failed to consider a treatment note from a treating psychiatrist, and failed to award her a closed period of disability. Berry's third argument has merit and requires remand.

In support of her third argument Berry claims the symptoms caused by her post traumatic stress disorder and adjustment disorder did not resolve themselves "even partially" until at least July 2002 and that she should therefore be granted a closed period of disability beginning on the date of her alleged onset of disability and ending at the earliest in July 2002. The Commissioner argues in part that records show Berry was "doctor shopping" and was discharged from a psychiatrist's care for medical non-compliance during the time period she claims she is entitled to a closed period of disability. Citing *Johnson v. Sullivan*, 894 F.2d 683, 685 n.4 (5th Cir. 1990), the Commissioner argues that failure to follow treatment without good reason may be grounds for a finding of no disability.

A review of the medical records does not support a conclusion that Berry was willfully "doctor shopping" or willfully non-compliant with treatment during the relevant period of time. To the contrary, the medical records show that Berry was compliant with treatment following her assault and that she suffered from significant limitations despite her compliance that would have impacted her ability to work and that she did not experience medical improvement until July 2002.

Berry's primary care physician examined her in October 2000 after the assault, found that she was depressed, and prescribed Paxil. (Tr. 268.) On November 21, 2000,

3

psychiatrist Arif Khan, M.D., examined Berry at the West Texas Centers for Mental Health and Mental Retardation (MHMR) in Colorado City, Texas. (Tr. 306-07.) Dr. Khan diagnosed adjustment disorder with depressed and anxious mood and assigned Berry a Global Assessment of Functioning (GAF) score of 50. (Tr. 307.) According to the Diagnostic and Statistical Manual of Mental Disorders, a GAF score of 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 34 (4th ed. 2000) (DSM-IV). Dr. Khan determined that Berry would continue treatment with Paxil and that she would be referred for counseling or group therapy at a facility such as that which addresses problems encountered by battered women. (*Id.*)

Less than one month later Berry's primary care physician noted that Berry was not handling things well, remained very depressed, was having problems sleeping, and was experiencing daily panic attacks and episodes of fear related to her physical assault. (Tr. 267.) He noted that she had been seen by health providers at the MHMR in Colorado City, Texas, but because the office did not have a counselor on staff, they recommended that she be referred to a psychiatrist. The physician increased Berry's dosage of Paxil, prescribed Xanax, and indicated that he would refer her to a psychiatrist in Abilene and that he would work closely with the psychiatrist on her medications. (*Id.*)

There is an apparent error in the examination notes. The physician indicated that the MHMR in Colorado City did not have a counselor on staff; however, rather than recommend

4

referral to a psychologist or counselor, he indicated that Berry would be referred to a psychiatrist and noted that he hoped "referral to psychiatric care [would] help." The records from the MHMR offices in Colorado City show that the facility did, in fact, have a psychiatrist on staff – Dr. Khan, the psychiatrist who treated Berry on November 21, 2000 – and his notes indicate that the facility did not have a counselor on staff. (Tr. 307.)

Berry was referred to Abilene Psychiatric Associates where she began undergoing psychiatric treatment and counseling on December 19, 2000. (Tr. 345.) Because of this, Dr. Khan discharged Berry from his care and discontinued medications for "noncompliance," noting that he had previously advised her that she should not be seeing two doctors; she was also undergoing treatment at Abilene Psychiatric Associates; and she was obtaining medication from her primary care physician in contradiction to his advice. (Tr. 328, 333-31.)

The records do not show that Berry was willfully doctor shopping or acting in noncompliance with Dr. Khan's instructions. First, Berry's primary care physician referred her to Abilene Psychiatric Associates for psychiatric care while she was undergoing treatment with Dr. Khan. (Tr. 267.) Second, it should be noted that as a child Berry was enrolled in special education classes, quit school in the ninth grade, was married when she was fourteen years old, and functions with low normal to borderline intellectual abilities. (Tr. 198, 200, 871.) These facts as well as other evidence in the record show that Berry was simply following the orders of her primary care physician who referred her to Abilene

Psychiatric Associates rather than "doctor shopping." In addition, the records show that Berry was compliant with the treatment recommendations of all the physicians who treated her during the time period she claims she is entitled to a closed period of disability.

Nothing in the records from her primary care physician or Dr. Khan show that she failed to comply with their medical orders. In addition, after Dr. Khan discharged her from his care, Berry continued to undergo treatment at Abilene Psychiatric Associates and notations in their records show that she was assessed on a regular basis and was compliant with treatment. (Tr. 337-345; see Tr. 338- 41 (numerous entries on various dates between January 5, 2001, and August 9, 2001, indicating that Berry was compliant with medications with no side effects). Despite complying with the medication regime recommended by her doctors, Berry experienced continuing depression, anxiety, sleep disturbances, and flash backs of the assault as well as shaking in her extremities, disorganized thinking, and feelings of victimization. (Tr. 337-45.)

In addition, there was no significant change in Berry's clinical diagnosis until July 2002. Dr. Khan indicated that Berry was functioning with a GAF of 50 in November 21, 2000. (Tr. 307.) Dr. Khan's opinion regarding Berry's GAF was confirmed by Berry's psychiatrist at Abilene Psychiatric Associates who diagnosed her with post traumatic stress disorder and assigned her a GAF of 50. (Tr. 345.) Examination notes from Samuel D. Brinkman, Ph.D., a neuropsychologist retained by the Texas Workers' Compensation Commission, show that Berry continued to suffer from symptoms that posed

major limitations on her ability to work. Dr. Brinkman examined Berry on June 28, 2001, and assigned her a GAF of 40, seven months after Dr. Khan assigned her a GAF of 50. (Tr. 199.) A GAF of 40 represents more serious symptoms than a GAF of 50 and would indicate either some impairment in reality testing or communication or a major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. DSM-IV at 34. Dr. Brinkman also found that Berry suffered from a mixed personality disorder that had caused the symptoms related to her post traumatic stress disorder to persist. (Tr. 201.)

On November 7, 2001, Dr. Khan agreed to readmit Berry for treatment at MHMR in Colorado City and examined her on November 7, 2001. (Tr. 328.) Dr. Khan indicated in his examination notes that Berry exhibited fine tremors which he attributed to anxiety, that she appeared very upset, and that she told him that her medications did not seem to help and she was not doing well. Dr. Khan noted that none of the treatment records showed that she had been doing well and diagnosed adjustment disorder with anxious mood. *Id.* Berry was next examined at the West Texas Centers for MHMR on January 24, 2002, by Eileen Farber, M.D. (Tr. 324-25.) Dr. Farber noted that Berry reported "what appears to be a conflict with the psychiatrist [at the MHMR in Colorado City]" and was told she would be transferred to the West Texas Centers for MHMR and that Dr. Khan had given her only a one month supply of refills on her medications. (Tr. 324.) Dr. Farber noted that Berry was extremely agitated and sobbed throughout the examination. *Id.* She also indicated that Berry's speech was

7

hyper-verbal, rambling, and disorganized; her mood was extremely labile, anxious, and depressed; her affect was full-range, tearful, sobbing, anxious, irritable, and demanding; she appeared to exhibit a degree of mild paranoia; and her concentration was impaired by her extreme anxiety and current presentation. (Tr. 325.) Dr. Farber prescribed new medications in addition to continuing Berry on some of the medications already prescribed for her. *Id.* She examined Berry again on February 14, 2002. (Tr. 323.) She indicated in part that there was a marked increase in Berry's lower extremity psychomotor activity noting that she sat with her legs shaking throughout the session; however, she also found that Berry's symptoms were improved. *Id.*

Subsequently, Berry was treated by Cheryl A. Hollingsworth, M.D., and her symptoms continued to improve under her care. Dr. Hollingsworth first examined Berry at the West Texas Centers for MHMR on May 10, 2002, and noted that Berry had been followed by various doctors at the center. (Tr. 321.) Although Berry had been taking her medications as prescribed, Dr. Hollingsworth noted that she continued to experience depression and anxiety and suffered from adjustment disorder with mixed depression and anxious mood along with personality disorder. She believed that the dosages of Berry's antidepressant medications needed to be increased. *Id.* During examination the following month Berry reported to Dr. Hollingsworth that the new combination of antidepressants prescribed were working well. (Tr. 320.) Dr. Hollingsworth increased one of Berry's antidepressants and discontinued some of the anti-anxiety medications. *Id.* In examination notes one month later

8

on July 5, 2002, Dr. Hollingsworth noted that Berry was doing well on the combination of antidepressant medications she prescribed and concluded that her adjustment disorder was in full remission. (Tr. 319.) Thereafter Berry's symptoms remained stable for a significant period of time when she was compliant with the treatment prescribed for her. (Tr. 309-11, 313-16, 318-19; *compare* Tr. 849.)

The foregoing evidence suggests that Berry's mental impairments presented significant symptoms that did not respond to treatment for at least twelve months after her assault in October 2000. The ALJ, however, found that Berry responded favorably to treatment from November 2000 to November 2003. (Tr. 22.) This was erroneous. The treatment records show Berry responded favorably to treatment only after she began treatment with Dr. Hollingsworth; records from Drs. Khan, Brinkman, and Hollingsworth, as well as records from Abilene Psychiatric Associates, show that Berry suffered from significant psychiatric symptoms which began after she was assaulted in October 2000 and continued until her treatment with Dr. Hollingsworth in late Spring 2002. Thus, there is evidence that refutes the conclusion that Berry was not disabled at any time after her alleged onset, and remand is required. *See Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986).

### III. <u>Recommendation</u>

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court reverse the Commissioner's decision and remand Berry's case for further administrative proceedings.

## IV. Right to Object

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within ten days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within ten days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated: November 29, 2006.

NANCY M. KOENIG
United States Magistrate Judge